

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**FILED**

**SEP - 9 2011**

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**EVANSTON INSURANCE COMPANY,**

   **Plaintiff,**

**v.**

**HARBOR WALK DEVELOPMENT, LLC;**
**THE PORTER-BLAINE CORP.;**
**GENESIS GROUP, INC.;**
**WERMERS DEVELOPMENT, INC.;**
**CLARK-WHITEHILL ENTERPRISES, INC.;**
**VENTURE SUPPLY, INC.; TOBIN TRADING,**
**INC.; TRADERSCOVE CORP d/b/a/**
**THE HENIN GROUP; PREMIER**
**INTERNATIONAL REALTY, INC., d/b/a/ HENIN**
**REALTY; INTERNATIONAL PROPERTY**
**INVESTMENTS OF CENTRAL FLORIDA,**
**INC., d/b/a/ HENIN INTERNATIONAL**
**SERVICES; HIGGERSON-BUCHANAN, INC.;**
**M&M CONTRACTING; P&P SKILLED**
**CONTRACTORS; WORK COMPANY,**
**DRWALL & PLASTER; JEROME HENIN,**
**individually; DAVID DANIELS, individually;**
**and MICHELLE GERMANO; DENIS**
**JACKSON; SHARON JACKSON;**
**JASON DUNAWAY; LISA DUNAWAY;**
**individually and on behalf of all others**
**similarly situated,**

   **Defendants.**

**Civil Action No. 2:10cv312**

## ORDER

  This matter is before the Court on Plaintiff Evanston Insurance Company's

("Plaintiff" or "Evanston") Motion for Summary Judgment. The motion has been fully

briefed and is ripe for disposition.

## I. FACTS

*A. The Three Underlying Lawsuits*

The dispute in the above-captioned case concerns three lawsuits (the "Underlying Lawsuits") filed by Defendants Jason Dunaway, Lisa Dunaway, Michelle Germano, Dennis Jackson, and Sharon Jackson (collectively, the "Homeowner Defendants") against Harbor Walk Development, LLC ("Harbor Walk"). The three lawsuits that comprise the Underlying Lawsuits are as follows.

On May 1, 2009 by the Homeowner Defendants, individually, and on behalf of all others situated, filed a class action suit in the Eastern District of Virginia[1] against Harbor Walk, The Porter-Blaine Corp., Taishan Gypsum Co. LTD, and Venture Supply Inc. ("Class Action Lawsuit"). Compl., Exh. A. On October 6, 2009, Defendant Michelle Germano filed an individual action in the Circuit Court for the City of Norfolk against Harbor Walk, Genesis Group, Inc., Wermers Development, Inc., Clark-Whitehill Enterprises, Inc., Venture Supply, Inc., The Porter-Blaine Corp., and Tobin Trading, Inc. ("Germano Lawsuit"). Compl., Exh. B. Finally, Defendants Dennis and Sharon Jackson filed an action in the Circuit Court for the City of Norfolk against Harbor Walk, Traderscove Corp., Premier International Realty, Inc., International Property Investments of Central Florida, Inc., Jerome Henin, David Daniels, Venture Supply, Inc., The Porter-Blaine Corp., Tobin Trading, Inc., Clark-Whitehill Enterprises, Inc., Higgerson-

---

[1] The case was transferred to the Multidistrict Litigation ("MDL") 2047 in the Eastern District of Louisiana. 2:09cv202.

Buchanan, Inc., M&M Contracting, P&P Skilled Contractors, and Work Company, Drywall & Plaster ("Jackson Lawsuit"). Compl., Exh. C.[2]

In the Underlying Lawsuits, the Homeowner Defendants allege that the Chinese drywall installed in their homes emits sulfides and other noxious gases[3] and that this causes corrosion and damage to property such as air-conditioning and ventilation units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, utensils, electronic appliances, and other personal items. Compl., Exh. A at ¶¶ 21-22; Exh. B at ¶ 13; Exh. C at ¶ 3. The Homeowner Defendants also claim that the compounds emitted by the drywall cause bodily injury, such as allergic reactions, respiratory afflictions, and sinus and bronchial problems requiring medical attention, including headaches. Compl., Exh. A at ¶ 23; Exh. B at ¶ 14; Exh. C at ¶ 4.

As a result of these factual allegations, the Homeowner Defendants have asserted various legal theories against Harbor Walk and the other homebuilder defendants, seeking inter alia damages for injuries to person[4] and property[5] and for the inspection, removal, and replacement of the drywall, including testing for and monitoring the alleged

---

[2] The parties dispute the date when the Jackson Lawsuit was filed. Evanston claims that it was filed on May 25, 2010—the date set forth in the complaint. Compl., Exh. C at 24. The Homeowner Defendants claim it was filed on July 21, 2009, but do not cite any evidence to support their claim. Mem. in Opp. at 2.

[3] The Homeowner Defendants dispute this fact, stating that the compounds released by the Chinese drywall "are undefined and further unspecified in terms of quantity, amount and nature." Mem. in Opp. at 3. While this may be true to the extent that the parties have not conducted discovery to determine precisely what the compounds are, Evanston is not attempting to prove the identity of the compounds. It is undisputed that the complaints in the Underlying Lawsuits identify the compounds as sulfides and other noxious gases.

[4] The Homeowner Defendants state that it is a disputed fact that the complaints in the Underlying Lawsuits disclose specific impacts to the Homeowner Defendants' health that would define the subject compounds as pollutants. Mem. in Opp. at 3. Evanston responds that this is not a disputed fact, and that it is simply argument that the sulfides and noxious gases are not "pollutants" within the meaning of the insurance policies. Reply at 5. In any case, the undisputed fact is that the complaints in the Underlying Lawsuits allege that the Homeowner Defendants suffered bodily injuries as a result of the gases emitted from the Chinese drywall.

[5] The Homeowner Defendants dispute this fact to the extent that Evanston claims that this damage was caused by environmental pollution. Mem. in Opp. at 3. It is undisputed, however, that the complaints in the Underlying Lawsuits allege damage to property as described above.

harmful effects of drywall. Compl., Exh. A at ¶ 88; Exh. B at ¶¶ 59, 62; Exh. C at ¶¶ 90,

93. These claims are relevant to this action because Evanston has sold three commercial

general liability insurance policies to Harbor Walk that contain language which obligates

Evanston to defend and indemnify Harbor Walk from lawsuits if certain conditions are

met. Compl., Exhs. D; E; F. Evanston filed the declaratory action with this Court on

June 29, 2010, requesting a judgment declaring that Evanston owes no duty to defend or

indemnify Harbor Walk in the three Underlying Lawsuits based on the provisions in the

insurance policies. Compl. at ¶ 58.

B. *The Insurance Policies*

Evanston issued three commercial general liability insurance policies to Harbor

Walk (the "Evanston Policies"). The Evanston Policies were delivered to Harbor Walk in

Virginia.[6] Reply, Exh. A at ¶¶ 5, 8, *8.[7] The first policy, Policy No. 03GLP1006568,

was initially effective from February 10, 2003 to February 10, 2004. Compl., Exh. D at

4. The policy was amended on February 10, 2004 to expire on February 1, 2005. Id. at

48. The policy has a general aggregate limit of $2,000,000, a products-completed

operations aggregate limit of $1,000,000, a per occurrence limit of $1,000,000, and a

$25,000 per occurrence deductible. Id. at 5, 14.

---

[6] In the memorandum in opposition to the Motion for Summary Judgment, the Homeowner Defendants pointed out that it was not clear from the exhibits filed in support of the Motion for Summary Judgment that the Evanston Policies were delivered in Virginia. Mem. in Opp. at 2-3. Evanston therefore attached the affidavit of Kevin Quinn to its reply, which states that the Evanston Policies were delivered to Harbor Walk in Virginia. Reply, Exh. A. In the reply, Evanston also notes that the Homeowner Defendants have subsequently represented that they do not dispute that the Evanston Policies were delivered in Virginia and that Virginia law governs the interpretation of the Evanston Policies. Reply at 3, n. 3. Accordingly, for the purposes of this motion, the Court will accept as undisputed fact the assertion that the Evanston Policies were delivered in Virginia.
[7] The affidavit of Kevin Quinn contains two paragraphs numbered "8." Reply, Exh. A. Accordingly, the Court will cite to the second paragraph 8 as "*8."

The second policy, Policy No. 05GLP1007502, was effective from February 10, 2005 to February 10, 2006.[8] Compl., Exh. E at 4. This policy has a general aggregate limit of $2,000,000, a products-completed operations aggregate limit of $1,000,000, a per occurrence limit of $1,000,000, and a $25,000 per occurrence deductible. Id. at 6, 13.

The third policy, Policy No. 06GLP1007502, was effective from February 10, 2006 to October 8, 2007.[9] Compl., Exh. F at 4, 57-58. The policy has a general aggregate limit of $2,000,000, a products-completed operations aggregate limit of $1,000,000, a per occurrence limit of $1,000,000, and is subject to a $50,000 per occurrence self-insured retention. Id. at 6, 13.

The Evanston Policies contain an Insuring Agreement that provides that Evanston will "pay those sums that the [insured] becomes legally obligated to pay because of 'bodily injury' or 'property damage' to which this insurance applies." Compl., Exh. D at 29; Exh. E at 32; Exh. F at 35. This includes the duty to defend any "suit" seeking those damages. Id. The Insuring Agreement limits coverage to "bodily injury" or "property damage" caused by an "occurrence" that "occurs during the policy period." Id.

The Evanston Policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Compl., Exh. D at 40; Exh. E at 43; Exh. F. at 46. The Evanston Policies define "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Compl., Exh. D at 38; Exh. E at 41; Exh. F at 44. The Evanston Policies define "property damage" to mean: "(a) Physical injury to

---

[8] The Evanston Policies did not cover Harbor Walk for the period from February 1, 2005 to February 10, 2005.
[9] The policy's initial period was from February 10, 2006 to December 10, 2009. Id. at 4. The policy was cancelled on October 8, 2007, however due to nonpayment. Id. at 57-58.

tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." Compl., Exh. D at 40; Exh. E at 43; Exh. F at 46.

The Evanston Policies contain exclusions to coverage. One of which is a pollution exclusion, which states the following:

**f.    Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants;

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Compl., Exh. D at 30; Exh. E at 33; Exh. F at 36. The Evanston Policies also limit the coverage provided to only those premises and projects listed in the endorsements. Specifically, the endorsement entitled "Limitation of Coverage to Designated Premises or Project" limits the commercial general liability coverage to either a specified project or

6

premises. Compl., Exh. D at 28; Exh. E at 31; Exh. F at 34.  General Change Endorsements specify that the policy only applies to losses arising out of bodily injury and property damage at certain locations.  Compl., Exh. D at 51; Exh. E at 46; Exh. F at 48, 55-56.

## II. PROCEDURAL HISTORY

On June 29, 2010, Evanston filed the complaint in the above-captioned case, requesting that this Court declare that it has no duty to defend or indemnify its insured, Harbor Walk, for any claims alleged in the Underlying Lawsuits.  Comp at ¶ 58.  On March 16, 2011, Evanston filed the Motion for Summary Judgment currently before the Court, requesting the Court to declare that Evanston has no duty to defend or indemnify Harbor Walk in the Underlying Lawsuits brought by the Homeowner Defendants as a matter of law.  Mot. for Summ. Judg. at 4.

On April 6, 2011, along with its Memorandum in Opposition to the Motion for Summary Judgment, the Homeowner Defendants filed a Motion for Certification.  Before Evanston responded to the Motion for Certification, on April 12, 2011, in Nationwide Mutual Insurance Co. v. Overlook, LLC, No. 4:10cv69 (E.D. Va. 2011), a court in this district facing similar issues as those in this case certified a question to the Supreme Court of Virginia.  As a result of the certification in Overlook and after Evanston filed its Reply to the Memorandum in Opposition to the Motion for Summary Judgment, the Homeowner Defendants filed a Motion to Stay pending a decision by the Supreme Court of Virginia.  The Court granted the motion, noting that an answer by the Supreme Court of Virginia would be informative on the reach of the pollution exclusions in this case, and held the Motion for Summary Judgment in abeyance.

7

On April 25, 2011, the Supreme Court of Virginia declined to accept the certified question of law in <u>Overlook</u>, and, on May 2, 2011, Evanston filed a Motion to Lift the Stay, requesting the Court to proceed with the Motion for Summary Judgment. On August 9, 2011, this Court entered an order lifting the stay and dismissing as moot the Homeowner Defendants' Motion for Certification. Because the stay is lifted and the Motion for Summary Judgment has been fully briefed, the Court will now address Evanston's Motion for Summary Judgment.

### III. LEGAL STANDARDS

*A. Applicable Law*

This case was brought before the Court under diversity of citizenship jurisdiction. Compl. at ¶ 2. In suits filed in federal court under diversity jurisdiction, questions of procedural law are governed by federal law. <u>E.g.</u>, <u>Gasperini v. Ctr. For Humanities, Inc.</u>, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L.Ed.2d 659 (1996). Therefore, this Court must apply the federal standard for summary judgment. <u>Gen. Accident Fire and Life Assurance Corp., Ltd. v. Akzona, Inc.</u>, 622 F.2d 90, 93 n. 5 (4th Cir. 1980).

Any questions of substantive law, however, are governed by the law of the forum state. "A federal court hearing a diversity claim must apply the choice-of-law rules of the state in which it sits." <u>Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.</u>, 407 F.3d 631, 635 (4th Cir. 2005) (citations omitted). In this case, the Complaint was filed in Virginia, and, therefore, Virginia's choice-of-law rules apply. "'Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured.'" <u>Id.</u> (citing <u>Seabulk Offshore, Ltd. v. Am. Home Assurance Co.</u>, 377 F.3d 408, 419 (4th Cir. 2004);

Buchanan v. Doe, 246 Va. 67, 70, 431 S.E.2d 289, 291 (1993)). In this case, it is an undisputed fact that the Evanston Policies were delivered to Harbor Walk in Virginia. Accordingly, the parties do not dispute that Virginia law governs the interpretation of the Evanston Policies.

### B. Standard of Review

According to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also McKinney v. Bd. of Trustees of Maryland Cmty. Coll., 955 F.2d 924, 928 (4th Cir. 1992) ("[S]ummary judgments should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not necessary to clarify the application of the law." (citations omitted)). In deciding a motion for summary judgment, the Court must view the facts and inferences to be drawn from the facts in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 586–87 (internal quotations omitted). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324,

106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). "Summary judgment is particularly well-suited

for resolution of insurance coverage disputes because the construction of insurance

contracts is a legal question." Mount Vernon Fire Ins. Co. v. Adamson, 3:09cv817, 2010

WL 3937336, at *2 (E.D. Va. Sept. 15, 2010) (citations omitted).

*C. Virginia Law of Insurance Contracts*

As explained in Section II.B.1, supra, while the Court must observe federal

procedure in assessing motions for summary judgment, it must apply the substantive law

of Virginia when interpreting the Evanston Policies. Because Evanston has requested

declaratory judgments on the issues of both its "duty to defend" and "duty to indemnify"

Harbor Walk, the Court will briefly address the rules of decision with respect to those

two duties before addressing general principles of Virginia insurance contract

interpretation.

*1. Duty to Defend and Duty to Indemnify*

"Under Virginia law, an insurer's duty to defend arises 'whenever the complaint

against the insured alleges facts and circumstances, some of which, if proved, would fall

within the risk covered by the policy.'" Penn-America Ins. Co. v. Coffey, 368 F.3d 409,

413 (4th Cir. 2004) (quoting Brenner v. Layers Title Ins. Corp., 240 Va. 185, 189, 397

S.E.2d 100, 102 (1990)). Duty to defend questions do "not require the district court to

resolve factual questions at all. It need only decide such coverage by comparing what

[the state court plaintiff] has alleged in the state court action with the language of the

[provider's] insurance policy." Id. "[T]here is no duty to defend 'if it appears clearly

that the insurer would not be liable under its contract for any judgment based upon the

allegations.'" Id. (quoting Brenner, 240 Va. at 189, 397 S.E.2d at 102). "Since courts

must only compare the allegations contained within the four corners of the complaint to the terms contained within the four corners of the insurance contract, this standard of review for duties to defend is often referred to as the 'Eight Corners Rule.'" <u>Nationwide Mutual Insurance Co. v. Overlook, LLC</u>, 4:10cv69, 2011 WL 1988396, at *8 (E.D. Va. May 13, 2011) (citations omitted).

The duty to indemnify, however, is a narrower obligation. This is because the duty to defend is based on the allegations in the underlying complaint, whereas the duty to indemnify relies on litigated facts. <u>CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 556 F.3d 150, 155 (4th Cir. 2009). "Although an insurer's duty to indemnify will depend on resolution of facts alleged in the complaint, no such factfinding is necessary if there is no duty to defend because the allegations, even when taken as proved, would fall outside the policy's coverage." <u>Penn-America</u>, 368 F.3d at 413.

*2. General Principles of Virginia Contract Interpretation*

"'Courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document.'" <u>Seals v. Erie Ins. Exchange</u>, 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009) (quoting <u>Floyd v. Northern Neck Ins. Co.</u>, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993)). "[A] court must adhere to the terms of a contract of insurance as written, if they are plain and clear and not in violation of law or inconsistent with public policy." <u>Blue Cross & Blue Shield v. Keller</u>, 248 Va. 618, 626, 450 S.E.2d 136, 140 (1994). "When the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." <u>PMA Capital Ins. Co. v. US Airways, Inc.</u>, 271 Va. 352, 359, 626 S.E.2d 369, 373 (2006) (citation omitted). It is not the function of the Court to "'make a new contract for the

parties different from that plainly intended and thus create a liability not assumed by the insurer.'" Keller, 248 Va. at 626, 450 S.E.2d at 140 (quoting Pilot Life Ins. Co. v. Crosswhite, 206 Va. 558, 561, 145 S.E.2d 143, 145 (1965)).

However, "because insurance companies typically draft their policies without the input of the insured, the companies bear the burden of making their contracts clear." Res. Bankshares Corp., 407 F.3d at 636. "Accordingly, if an ambiguity exists, it must be construed against the insurer." Id. (citations omitted). "A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning." Id. (citation omitted). "In determining whether the provisions are ambiguous, we give the words employed their usual, ordinary, and popular meaning." Nextel Wip Lease Corp. v. Saunders, 276 Va. 509, 516, 666 S.E.2d 317, 321 (2008) (citation omitted). "An ambiguity, if one exists, must be found on the face of the policy," Granite State Ins. Co. v. Bottoms, 243 Va. 228, 233-34, 415 S.E.2d 131, 134 (1992) (citation omitted), and "courts must not strain to find ambiguities." Res. Bankshares Corp., 407 F.3d at 636 (citations omitted). "[C]ontractual provisions are not ambiguous merely because the parties disagree about their meaning." Nextel Wip, 276 Va. at 516, 666 S.E.2d at 516.

3. *Burdens of Proof*

"A policyholder bears the burden of proving that the policyholder's conduct is covered by the policy." Res. Bankshares Corp., 407 F.3d at 636 (citations omitted). If the policyholder carries that burden, "the insurer bears the burden of proving that an exclusion applies." Bohreer v. Erie Ins. Group, 475 F. Supp. 2d 578, 585 (E.D. Va. 2007) (citations omitted).

## IV.  DISCUSSION

Evanston argues that the Court should grant the Motion for Summary Judgment and declare that Evanston has no duty to defend or indemnify Harbor Walk against the claims in the Underlying Lawsuits because the pollution exclusions in the Evanston Policies bar coverage of the Homeowner Defendants' claims.  The Homeowner Defendants respond that the pollution exclusions are ambiguous, and as a result, the language should be construed against the insurer and in favor of coverage.  As this dispute focuses solely on the applicability of an exclusion to coverage in the Evanston Policies, Evanston, as the insurer, has the burden of proving that the exclusion applies.  Bohreer, 475 F. Supp at 585.

As previously discussed, the question of whether the exclusion applies is addressed under the Eight Corners Rule.  The Court must compare the allegations in the Homeowner Defendants' complaints in the Underlying Lawsuits to the language of the pollution exclusions in the Evanston Policies and determine if the allegations in the complaints unambiguously fall within the reach of the exclusions.  Penn-America, 368 F.3d at 413.  If the allegations are within the exclusion, with no allegations falling outside the exclusions, Evanston has no duty to defend Harbor Walk with respect to the Homeowner Defendants claims in the Underlying Lawsuits.  Further, if there is no duty to defend, there can be no duty to indemnify because the duty of indemnification applies in a narrower set of circumstances than the duty to defend.  Id.

In analyzing whether the pollution exclusion bars coverage of all the claims in the Underlying Lawsuits, the Court must make the following inquiries:  (a) is the language in the pollution exclusions ambiguous; (b) do the claims fit within the pollution exclusions;

13

and (c) are all claims in the Underlying Lawsuits covered. See Overlook, 2011 WL 1988396, at \*12-\*30 (applying a similar form of analysis when determining whether a pollution exclusion applied to bar coverage of claims arising from the installation of Chinese drywall asserted by a homeowner in state court).

A. *Whether the Pollution Exclusions are Ambiguous*

The pollution exclusions bar from coverage "bodily injury" or "property damage" "which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." Compl., Exh. D at 30; Exh. E at 33; Exh. F at 36. The exclusions define "pollutants" as "any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields and waste." Id.

The Homeowner Defendants argue that the use of environmental terms in the exclusion is meant to limit the application of the exclusion to damages caused by "traditional pollution events," and not the emission of gas from building material occurring inside a house. Mem. in Opp. at 6-7. The Homeowner Defendants insist that their reading of the pollution exclusions is reasonable and, therefore, that the exclusions are ambiguous because they are susceptible to more than one interpretation. Because ambiguous language in an insurance policy is construed against the insurer and in favor of coverage, Res. Bankshares Corp., 407 F.3d at 636, the Homeowner Defendants conclude that the Court should adopt its interpretation of the pollution exclusions and find that the claims in the Underlying Lawsuits are not barred by the exclusions. Mem. in Opp. at 28.

14

"A policy provision is ambiguous when, in context, it is capable of more than one reasonable meaning." Bankshares Corp., 407 F.3d at 636 (citations omitted). The issue for the Court, then, is whether the language in the pollution exclusions is capable of more than one meaning as applied to claims for damages that occurred due to the release of gases from Chinese drywall. Courts in this district that have addressed this issue have concluded that similarly worded pollution exclusions are unambiguous in this context, Overlook, 2011 WL 1988396, at *14; TRAVCO Ins. Co. v. Ward, 715 F. Supp. 2d 699, 717 (E.D. Va. 2010), and, after reviewing the relevant jurisprudence, the Court can find no reason to divert from such a conclusion here.

Specifically, the Supreme Court of Virginia's decision in City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 271 Va. 574, 628 S.E.2d 539 (2006) provides the starting point for the Court's analysis. See Overlook, 2011 WL 1988396, at *15 (looking first to City of Chesapeake for guidance as to how the Supreme Court of Virginia would apply Virginia law to a pollution exclusion); TRAVCO Ins. Co., 715 F. Supp. 2d at 716 (looking to City of Chesapeake as an indication of how the Supreme Court of Virginia would apply the law in this context). In City of Chesapeake, the Supreme Court of Virginia addressed the certified question of whether a pollution exclusion containing a similar definition of the term "pollutant" barred coverage for damages allegedly caused by the release of trihalomethanes ("THMs") into a city's water supply. 271 Va. at 576, 628 S.E. 2d at 540. Relying on a federal environmental statute and accompanying regulations designed to regulate drinking water, the Supreme Court of Virginia concluded that because the federal statute defined THMs as contaminants, and because the insurance policy defined "pollutants" to include "contaminants," THMs were

pollutants as that term was defined in the policy. Id. at 578, 628 S.E.2d at 541. Of

particular relevance is the Supreme Court of Virginia's refusal to look at other

jurisdictions for guidance as to how to interpret the pollution exclusion. The Court stated

that "[i]t is unnecessary to do so . . . because the law of this Commonwealth and the plain

language of the insurance policy provide the answer to the certified question." Id. at 579,

628 S.E.2d at 542. As interpreted by a court in this district, the Supreme Court of

Virginia "simply applied the facts of the case to the language presented in the policy's

pollution exclusion clause, and analyzed the results under well-established Virginia

contract law." Firemen's Ins. Co. v. Kline & Son Cement Repair, Inc., 474 F. Supp. 2d

779, 796 (E.D. Va. 2007) (citing City of Chesapeake, 628 S.E.2d at 542).

Based on the Supreme Court of Virginia's decision in City of Chesapeake, courts

in this district have found that pollution exclusions worded similarly to the exclusions in

this case unambiguously apply to non-traditional pollution.[10] For example, in Firemen's

---

[10] The Homeowner Defendants urge the Court to depart from the holdings in the other decisions issued by courts in this district because the Fourth Circuit, in NGM Insurance Co. v. Kuras, 407 Fed. Appx. 653 (4th Cir. 2011) (per curiam) (unpublished), affirmed a district court from the District of South Carolina's decision that found a similarly worded exclusion to be ambiguous. The district court, in NGM Insurance Co. v. Carolina's Power Wash & Painting, LLC, 2010 WL 146482 (D. S.C. Jan. 12, 2010), analyzed whether, under South Carolina law, an "absolute pollution exclusion" unambiguously applied to claims made by postal employees against a company the post office hired for injuries suffered due to exposure to paint fumes. Id. at *2. The district court noted that this was a matter of first impression under South Carolina law and then relied on the New York Court of Appeals decision in Belt Painting Corp. v. TIG Insurance Co., 100 N.Y.2d 377, 795 N.E.2d 15 (2003) in finding that the language in the exclusion could reasonably be interpreted as limiting the application of the exclusion to traditional environmental pollution. Id. at *6. On appeal, the Fourth Circuit affirmed the district court's decision in an unpublished, per curiam opinion "on the basis of the district court's well reasoned opinion." 407 Fed. Appx. at 655 (citation omitted).

In this case, however, the Court must apply Virginia law and, therefore, must follow the Supreme Court of Virginia's decision in City of Chesapeake. As discussed in more detail infra, courts in this district following City of Chesapeake have found that pollution exclusions unambiguously apply to non-traditional pollution. Furthermore, the Fourth Circuit has upheld decisions under District of Columbia and Maryland law that reach the same conclusion. Nat'l Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co., 162 F.3d 821, 825-26 (4th Cir. 1998) (finding pollution exclusion to be unambiguous under District of Columbia law); Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997, 1006 (4th Cir. 1998) (finding pollution exclusion to be unambiguous under Maryland law). Therefore, an unpublished, per curiam decision from the Fourth Circuit that upholds the decision of a district court applying South Carolina law on the basis of sound

Insurance Co. v. Kline & Son Cement Repair, Inc., 474 F. Supp. 2d 779 (E.D. Va. 2007),

the court found that a similarly worded pollution exclusion[11] barred from coverage an

employee's claims against the insured for injuries suffered due to exposure to fumes

inside a warehouse. Id. at 798-99. The insured argued, similar to the Homeowner

Defendants' assertions, that the language in the exclusion—"discharge, dispersal,

seepage, migration, release or escape"—are environmental terms of art which should

apply only to discharges of pollutants into the environment and not to injuries resulting

from the release of fumes inside a building. Id. at 796. The Firemen's Ins. Co. court

looked at the language in the pollution exclusion and disagreed with the insured, finding

that "[n]othing in the language of the Policy or the Pollution Exclusion clause at issue

suggests that the parties intended only 'traditional' or 'outdoor' pollution scenarios to be

excluded from coverage." Id. at 797. The court reasoned:

> Nowhere in the Policy is there any reference to the word "environment,"
> "environmental," "industrial," or any other limiting language suggesting
> the pollution exclusion is not equally applicable to both "traditional" and
> indoor pollution scenarios. The Pollution Exclusion clause does not say
> the discharges or dispersals of pollutants must be "into the environment"
> or "into the atmosphere," or in any way indicate that environmental
> "incidents" are the only conditions that bar coverage under the clause. On
> the contrary, considering the exclusion language in its entirety, it broadly
> applies to "the actual, alleged or threatened discharge, dispersal, seepage,
> migration, release or escape of...any solid, liquid, gaseous or thermal
> irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis,
> chemicals and waste...at any time." (The Policy at FIC000056,
> FIC000059.) The Pollution Exclusion is quite specific.

---

reasoning is not enough to persuade the Court that the decisions issued by other courts in this district
applying Virginia law are unsound.
[11] The pollution exclusion in Firemen's Ins. Co. states: "This insurance does not apply to . . . f. Pollution .
. . (1) 'Bodily injury' or 'property damage' which would not have occurred in whole or part but for the
actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at
any time." Id. at 783. The court further noted that "the Policy defines 'pollutants' as 'any solid, liquid,
gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals
and waste.'" Id. (quoting the relevant insurance policy).

Id. at 796. The court noted that the "drafters of the clause could have used words of limitation to exempt indoor (i.e. non-industrial) air pollution from its application, but they did not do so," and reasoned that "it would be impermissible for the Court to construe the clause as creating an ambiguity where none exists. . . . [T]he Pollution Exclusion clause is sweeping, excepting both environmental and indoor pollution occurrences from coverage." Id. at 797.

In this case, the pollution exclusions similarly except from coverage "'bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." Compl., Exh. D at 30; Exh. E at 33; Exh. F at 36. The term "pollutant" is not undefined; the Evanston policies state that "pollutant means any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields and waste. Waste includes materials to be recycled, reconditioned or reclaimed." Id. Similar to the exclusion in Firemen's Ins. Co., the language in the exclusions does not limit its application to traditional environmental pollution. Pursuant to the Supreme Court of Virginia's decision in City of Chesapeake, the Court will not look to other sources to add ambiguity to a clause that on its face is clear and unambiguous. Accordingly, the Court concludes that the pollution exclusions are unambiguous and the Court will not limit the exclusions to only "traditional environmental pollution."

This conclusion is consistent with the recent decision by a court in this district in Nationwide Mutual Insurance Co. v. Overlook, LLC, 2011 WL 1988396 (E.D. Va. May 13, 2011), in which a homeowner who had filed a state court lawsuit against the insured

for damages caused by gases emitted from Chinese drywall also attempted to persuade a court in this district that the language in a similarly worded pollution exclusion was ambiguous.[12] Id. at *14-*15. The Overlook court rejected the homeowner's argument and found the language to be unambiguous, relying on, inter alia, the Supreme Court of Virginia's decision in City of Chesapeake and the Firemen's Ins. Co. court's application of City of Chesapeake in the context of injuries caused by non-traditional pollution. Id. at *14-*16.

The Homeowner Defendants urge the Court to find the pollution exclusions ambiguous for various reasons, all of which have been addressed and rejected by the Overlook court and none of which the Court finds persuasive. First, the Homeowner Defendants assert that the Court should find ambiguity because courts disagree as to whether a pollution exclusion is limited to traditional environmental pollution. Mem. in Opp. at 8-10. The Supreme Court of Virginia in City of Chesapeake indicated that when interpreting these exclusions, courts should look to the language of the exclusion and not to the interpretations by other districts. Overlook, 2011 WL 1988396, at *15, *18. "[U]nder Virginia law, an insurance policy is not ambiguous merely because courts of varying jurisdictions differ with respect to the construction of policy language." Firemen's Ins. Co., 474 F. Supp. 2d at 799 (citing Nationwide Mutual Ins. Co. v. Wenger, 222 Va. 263, 278 S.E.2d 874, 877 (1981)). Ambiguity must be found on the face of the policy. Id. (citation omitted).

---

[12] The pollution exclusion in Overlook states: All of the Nationwide Liability and certain of the Excess Liability Coverages provide that the liability insurance does not apply to: 1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants." Id. at *4. The coverage generally defined "pollutants" as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Id. at *3.

The Homeowner Defendants also argue that the language in the exclusions consists of environmental terms of art that have no meaning outside the context of traditional environmental pollution.   In support of their argument, the Homeowner Defendants provide definitions for the terms "pollutant," "discharge," "seepage," "dispersal," "migration," "release," and "escape" from statutory provisions, administrative regulations, and the dictionary, and they conclude that such terms do not apply to a non-traditional pollution scenario. Mem. in Opp. at 10-15. The Homeowner Defendants reason that this is because the pollution exclusion was created after Congress passed certain environmental legislation, such as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., and the purpose of the exclusion is to exclude from coverage the costs associated with environmental clean-ups mandated by that legislation. Id. at 19-20.

When interpreting terms in a policy, however, Virginia law requires the Court to first look to the policy to determine whether the terms have been defined.  In this case, the Evanston Policies define "pollutant" to mean "any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields and waste.  Waste includes materials to be recycled, reconditioned or reclaimed."   Compl., Exh. D at 30; Exh. E at 33; Exh. F at 36.  While some may associate the term "pollution" only with acts that constitute traditional environmental pollution, the Evanston Policies assign a specific definition and do not leave the term "pollutant" open to such an interpretation.  Accordingly, the term as defined by the policy is not ambiguous.  See Overlook, 2011 WL 1988396 at *19 ("Under Virginia law, the Court is not free to find an ambiguity in a defined term solely because the definition

chosen by the parties differs from what might otherwise be the commonly recognized definition of the term.").

Regarding the terms "discharge," "seepage," "dispersal," "migration," "release," and "escape," the Homeowner Defendants are correct in pointing out that these terms are not defined by the Evanston Policies. This alone, however, does not mean that the terms are ambiguous. "Because the words 'discharge,' 'dispersal,' 'seepage,' 'migration,' 'release,' or 'escape,' are not defined by [the policies], they must be given their usual, common, and ordinary meaning." Firemen's Ins. Co., 474 F. Supp. 2d at 798 (citing D.C. McClain, Inc. v. Arlington County, 249 Va. 131, 135, 452 S.E.2d 659, 662 (1965)). Of particular relevance to this argument, "disperse" means "to spread or distribute from a fixed or constant source," "release" means "to set free from restraint, confinement, or servitude," and "escape" means "to issue from confinement <gas is escaping>." See Merriam–Webster Online Dictionary (2011). These terms have meaning in the context of this case—gases can be said to be released from a source inside the home such as drywall—and, without language suggesting otherwise, these terms cannot be interpreted to limit the application of the exclusions. Thus, the use of these terms does not add ambiguity to the pollution exclusions.

The Homeowner Defendants respond that the Court cannot interpret the exclusions to apply to the injuries alleged in this case because such an interpretation would be unreasonable. In support of their argument, the Homeowner Defendants reference the following quote from Virginia Farm Bureau Mutual Insurance Co. v. Williams, 278 Va. 75, 677 S.E.2d 299 (2009): "[W]hen an insurer seeks to limit coverage under a policy, the insurer must use language that is reasonable, clear, and

unambiguous." Id. at 81, 677 S.E.2d at 302 (citing Lower Chesapeake Assoc. v. Valley

Forge Ins. Co., 260 Va. 77, 88, 532 S.E.2d 325, 331 (2000); Granite State Ins. Co. v.

Bottoms, 243 Va. 228, 233, 415 S.E.2d 131, 134 (1992)). The Homeowner Defendants

insist that this quote means that the Supreme Court of Virginia now requires courts

reviewing limiting language in an insurance policy to determine whether interpreting the

policy to exclude coverage is reasonable.

The analysis of the Supreme Court of Virginia in Williams, however, does not

lead the Court to the conclusion drawn by the Homeowner Defendants. In Williams, the

Supreme Court of Virginia addressed whether language in an automobile insurance

policy unambiguously prevented the stacking of uninsured/underinsured motorist

coverage for bodily injury for all vehicles listed in the policy. Id. at 78, 677 S.E.2d at

300. The Supreme Court of Virginia found that the limitation in the policy was

ambiguous but the Court did not, as the Homeowner Defendants suggest, reach that

conclusion because it found that failing to stack coverage would lead to an unreasonable

result. Id. at 83, 677 S.E.2d at 303. Instead, the Court analyzed the language in the

policy and found that the policy did not clearly prevent stacking of coverage. Id. Given

that no other case from the Supreme Court of Virginia mandates that courts conduct a

reasonableness analysis, this Court will not conduct such an analysis based on an isolated

quote from a decision that does not itself refuse to apply an exclusion based on the

reasonableness of that exclusion.[13] See Overlook, 2011 WL 1988396, at *20 ("[T]he

---

[13] It is likely that the quote from Williams refers to the principle that a provision is ambiguous if it is
subject to more than one reasonable interpretation. As previously noted, the Supreme Court of Virginia
cited two cases in support of the quote: Lower Chesapeake Associates v. Valley Forge Insurance Co., 260
Va. 77, 532 S.E.2d 325 (2000), and Granite State Insurance Co. v. Bottoms, 243 Va. 228, 415 S.E.2d 131
(1992). In Lower Chesapeake, the Supreme Court of Virginia required only that exclusions to coverage be
clearly and unambiguously drafted. 260 Va. at 88, 532 S.E.2d at 331 (citation omitted). In Granite State,
the Supreme Court of Virginia did state that "[r]easonable exclusions not in conflict with the statute will be

Court is hesitant to attribute a significant new feature of Virginia insurance law, namely, that the Court must conduct a 'reasonableness' analysis when judging exclusionary language in insurance contracts, solely on the basis of an isolated word the Supreme Court of Virginia used in its statement of the rule.").

Along the same vein, the Homeowner Defendants urge the Court to apply its interpretation to the pollution exclusions because to limit coverage in this case would frustrate the insured's reasonable expectations. However, "Virginia has never explicitly adopted the reasonable expectations doctrine by which an insured's expectations as to the scope of coverage must be upheld, provided that such expectations are objectively reasonable." Firemen's Ins. Co., 474 F. Supp. 2d at 798 (citing Norfolk & W. Ry. V. Accident & Casualty Ins. Co., 796 F. Supp. 929, 933 (W.D. Va. 1992)). Even if applicable, the doctrine would not apply in this case because the doctrine is used to give meaning to an ambiguous provision, not to create ambiguity. Id. (citing Allison E. Butler, 22 Holmes' Appleman on Insurance 2d § 7.2 (Matthew Bender, Inc. 2003 & Supp. 2006)).

Finally, the Homeowner Defendants argue that to apply the pollution exclusions so as to exclude from coverage cases dealing with non-traditional environmental pollution would construe the exclusion too broadly and would lead to absurd results. Mem. in Opp. at 15-19. Specifically, the Homeowner Defendants cite the Supreme Court of Virginia's decision in Granite State in support of their proposition that the pollution exclusions in this case are ambiguous due to their broad application. Id. at 15.

---

enforced, but it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous." 243 Va. at 233, 415 S.E.2d at 134 (citation omitted). In its analysis, however, the Virginia Supreme Court did not conduct a substantive reasonableness analysis of an exclusion. Any reasonableness analysis that did occur was related to determining whether a provision could be read in more than one way. Id. at 234-35, 415 S.E.2d at 134-35. Therefore, the Court is not convinced that the Supreme Court of Virginia in Williams intended to introduce a new reasonableness requirement for exclusions.

In Granite State, however, the exclusion in question was not a pollution exclusion and the case did not involve indoor or outdoor pollution. Instead, the Supreme Court of Virginia addressed whether the following exclusion in an insurance contract issued to a "home for adults" barred coverage for burns suffered by a resident in the bathtub or shower at the home: "[T]he insurance does not apply to bodily injury . . . due to . . . the rendering of or failure to render . . . any service or treatment conducive to health or of a professional nature." 243 Va. at 232, 415 S.E.2d at 133. The Supreme Court of Virginia concluded that the exclusion's term "conducive to health" was overbroad and ambiguous. Id. at 235, 415 S.E.2d at 135. Indeed, the exclusion could have swallowed the coverage provided for in the policy. The relevant section of coverage was entitled "Coverage for Designated premises and Related Operations in Progress Other Than Structural Alterations, New Construction and Demolition," and the insuring agreement provided that the insurer "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury . . . to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental thereto." Id. at 232, 415 S.E.2d at 133. The exclusion, however, barred from coverage injuries that occurred due to the failure of the insured to provide services "conducive to health." This would seemingly exclude any injury that occurred in the house if read to apply to situations in which a resident was burned in a shower or bathtub. Thus, such an application would negate all coverage under this section of the policy.

The Supreme Court of Virginia also emphasized that at trial, the insurer's counsel took the position that the policy would provide coverage to injuries resulting from slips

and falls on the premises, but that injuries resulting from hot water in the shower and
bathtub were not covered. This seemingly conflicting interpretation confused the
Supreme Court of Virginia as to what sort of injuries were covered by the phrase
"conducive to health" and contributed to the finding of ambiguity. Id. at 235, 415 S.E.2d
at 135.

The facts in this case, however, are distinguishable from those in Granite State.
The Homeowner Defendants, unlike the insured in Granite State, do not assert that the
pollution exclusions, if interpreted to apply in the context of non-traditional pollution,
would bar all coverage under the Evanston Policies. Furthermore, Evanston's proposed
interpretation of the pollution exclusions, unlike the insurer's in Granite State, is clear
and consistent.

More importantly, analogies to insurance policies that cover "adult homes" are
not persuasive or relevant to the interpretation of the exclusion in this case because the
Supreme Court of Virginia, in City of Chesapeake, interpreted an exclusion similar to the
one in this case and declined to find it ambiguous. The Supreme Court of Virginia
instructed courts to interpret a pollution exclusion based on the language in the policy.
271 Va. at 579, 628 S.E.2d at 542. Admittedly, the language leads to a broad application
of the exclusion, but under Virginia law, "'[c]ourts interpret insurance policies, like other
contracts, in accordance with the intention of the parties gleaned from the words they
have used in the document.'" Seals, 277 Va. at 562, 674 S.E.2d at 862 (quoting Floyd,
245 Va. at 158, 427 S.E.2d at 196). Accordingly, this Court refuses to read Granite State,
a case dealing with a different factual scenario and a different exclusion, as requiring the

Court to find ambiguity where <u>City of Chesapeake</u> has found an exclusion similar to the one in this case to be unambiguous.

In sum, the pollution exclusions in this case clearly and unambiguously apply to injuries caused by both traditional and non-traditional pollution. Pursuant to the Supreme Court of Virginia's directive in <u>City of Chesapeake</u>, the Court will not limit the application of the exclusion to traditional environmental pollution when the language in the exclusion does not suggest such a limitation.

*B. Whether the Pollution Exclusions Apply to the Homeowner Defendants' Claims*

Because the pollution exclusions are unambiguous, when determining whether the Homeowner Defendants claims fall within the reach of the exclusions, the Court "must simply apply the plain language of the [exclusions] to the allegations in [the C]omplaint to determine if coverage is excluded." <u>Overlook</u>, 2011 WL 1988396, at *26. Pursuant to the pollution exclusions, the Evanston Policies do not apply to "bodily injury" or "property damage" arising from discharge, dispersal, seepage, migration, release or escape of pollutants. Compl., Exh. D at 30; Exh. E at 33; Exh. F at 36. Therefore, the first inquiry for the Court is whether the injuries alleged in the complaints in the Underlying Lawsuits constitute "bodily injury" or "property damage."

The Evanston Policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Compl., Exh. D at 38; Exh. E at 41; Exh. F at 44. The Evanston Policies define "property damage" to mean: "(a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically

injured.  All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."  Compl., Exh. D at 40; Exh. E at 43; Exh. F at 46.

In the complaints, the Homeowner Defendants allege that the Chinese drywall installed in their homes emits sulfides and other noxious gases  and that this causes corrosion and damage to property such as air-conditioning and ventilation units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, utensils, electronic appliances, and other personal items.  Compl., Exh. A at ¶¶ 21-22; Exh. B at ¶ 13; Exh. C at ¶ 3.  The Homeowner Defendants also claim that the compounds emitted by the drywall cause bodily injury, such as allergic reactions, respiratory afflictions, sinus and bronchial problems requiring medical attention, including headaches.  Compl., Exh. A at ¶ 23; Exh. B at ¶ 14; Exh. C at ¶ 4.  As a result, while the language in each complaint varies, the Homeowner Defendants generally state that damages include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the defective drywall and other property that has been impacted; lost value or devaluation of their homes and property; loss of use and enjoyment of their home and property; costs of relocation; and/or damages associated with personal injuries.  Compl., Exh. A at ¶ 27; Exh. B at ¶ 85; Exh. C at ¶ 8.  The Homeowner Defendants also claim that as a result of the damage, they have need for injunctive relief in the form of environmental testing and medical monitoring.  Compl., Exh. A at ¶ 28; Exh. B at ¶ 86; Exh. C at ¶ 9.

Based on the definitions in the Evanston Policies and the allegations in the complaints from the Underlying Lawsuits, the Homeowner Defendants' alleged injuries qualify as either a "bodily injury" or as "property damage."  The allegations have to do

either with physical sickness or the loss of use of the home or physical damage to the home. See Overlook, 2011 WL 1988396, at *13 (applying similar state court allegations of injuries to a similarly worded pollution exclusion and finding that the alleged injuries constituted either "bodily injury" or "property damage" as defined by the insurance policy). Furthermore, the pollution exclusions in the Evanston Policies contain a section that excludes from coverage costs related to repairs, testing, and monitoring resulting from pollution. Compl., Exh. D at 30; Exh. E at 33; Exh. F at 36. Therefore, the alleged injuries fall within the scope of injuries covered by the pollution exclusions.

The next inquiry for the Court is whether the alleged bodily injuries and property damage were caused in whole or in part by the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. Compl., Exh. D at 30; Exh. E at 33; Exh. F at 36. As defined by the Evanston Policies, "pollutant" contains two elements: (1) any solid, liquid, gaseous, or thermal (2) irritant or contaminant. The policies provide the following examples: "smoke, vapor, soot, fumes, acids, alkalis, chemicals, electromagnetic fields and waste. Waste includes materials to be recycled, reconditioned or reclaimed." Id. In this case, the first element is easily satisfied because the Homeowner Defendants claim that their damages were caused by gases.

In order to determine whether the gases are considered "irritants" or "contaminants," the Court must look to the plain meaning of those terms as no definition is provided by the Evanston Policies. D.C. McClain, 249 Va. at 135, 452 S.E.2d at 662. "Irritant" is defined as "causing irritation," and "irritate" is defined as "to provoke impatience, anger, or displeasure in." "Contaminant" is defined as "something that

contaminates," and "contaminate" is defined as "to make unfit for use by the introduction of unwholesome or undesirable elements." See Merriam–Webster Online Dictionary (2011). In this case, the complaints from the Underlying Lawsuits state that the sulfides and other noxious gases corroded materials in the house and caused health risks. Compl., Exh. A at ¶¶ 21-23; Exh. B at ¶¶ 13-14; Exh. C at ¶¶ 3-4. Such damages can be classified as making the home "unfit for use" and as causing the homeowners displeasure. Accordingly, the Court concludes that the sulfides and noxious gases alleged in the Underlying Lawsuits constitute "pollutants" as defined by the Evanston Policies.

Finally, in order for the pollution exclusions to bar coverage, the complaints from the Underlying Lawsuits must allege that the pollutants discharged, dispersed, seeped, migrated, released or escaped. As previously discussed, three of these terms have particular relevance in this context: "disperse" means "to spread or distribute from a fixed or constant source," "release" means "to set free from restraint, confinement, or servitude," and "escape" means "to issue from confinement <gas is escaping>." See Merriam–Webster Online Dictionary (2011). In this case, the complaint from the Class Action Lawsuit alleges that the Chinese drywall "release[s] sulfides and other noxious gases." Compl., Exh. A at ¶ 21. The complaints from the other two Underlying Lawsuits allege that the Chinese drywall "emits various sulfide gases and/or other toxic chemicals." Compl., Exh. B at ¶ 13; Exh. C at ¶ 3. While "emit" is not included in the pollution exclusions, "discharge" and "release" are listed as synonyms for the term "emit." See Merriam–Webster Online Dictionary (2011). Accordingly, the Court concludes that the complaints from the Underlying Lawsuits allege movement on the part

of the gases that fall within the scope of the pollution exclusions, and, therefore, that the pollution exclusions apply to the claims in the Underlying Lawsuits.

The Homeowner Defendants argue that the claims in the Underlying Lawsuits do not fall within the scope of the exclusions because the exclusions contain "but for" causation language and Evanston has not demonstrated that but for the release of the gases from the drywall the damages would not have occurred. Mem. in Opp. at 27. This argument is without any merit because, according to the Eight Corners rule, Evanston does not need to prove anything to persuade the Court that it has no duty to defend. Penn-America, 368 F.3d at 413. Evanston need only show that the complaints from the Underlying Lawsuits allege such causation, and, in this case, the complaints do so allege. The Homeowner Defendants claim that the personal injuries and property damages were caused by the emission of the gases from the Chinese drywall. Compl., Exh. A at ¶¶ 21-23; Exh. B at ¶¶ 13-14; Exh. C at ¶¶ 3-4.

C. *Whether All Claims from the Underlying Lawsuits are Covered*

The final inquiry for the Court is whether all of the claims alleged in the Underlying Lawsuits are covered by the pollution exclusions. See Parker v. Hartford Fire Ins. Co., 222 Va. 33, 35, 278 S.E.2d 803, 804 (1981) ("When an initial pleading 'alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy,' the insurance company is obliged to defend its insured." (quoting Lemer v. Safeco, 219 Va. 101, 104, 245 S.E.2d 249, 251 (1978))).

The Homeowner Defendants allege the following causes of action against Harbor Walk in the Underlying Lawsuits: negligence, negligence per se, breach of express and/or implied warranties, breach of contract, breach of implied warranty of merchantability,

breach of implied warranty of fitness for a particular purpose, private nuisance, unjust enrichment, violation of the Virginia Consumer Protection Act, fraud, and equitable and injunctive relief and medical monitoring. Compl., Exh. A, B, C. Each of the aforementioned causes of action implicates the emission of sulfides and noxious gases from the Chinese drywall as either the basis for the claim, or the cause of the resulting damages. Thus every cause of action falls within the reach of the pollution exclusions, and the Court finds that the pollution exclusions bars all of the claims made by the Homeowner Defendants in the Underlying Lawsuits from coverage under the Evanston Policies. See Overlook, 2011 WL 1988396, at *28 (finding that every claim from the underlying lawsuit implicated the pollution exclusion because "every claim in the underlying . . . complaint implicates the defective drywall as either the basis for the claim, or the cause of the resulting damages"). Pursuant to the Eight Corners Rule, Evanston has no duty to defend, and therefore, no duty to indemnify Harbor Walk against the claims in the Underlying Lawsuits. Accordingly, Evanston's Motion for Summary Judgment will be granted.

Before doing so, however, it is noted that even if the pollution exclusions did not apply, other provisions in the Evanston Policies operate to deny coverage of Defendants Jason Dunaway and Lisa Dunaway's claims in the Class Action Lawsuit and all claims in the Jackson Lawsuit. Regarding the Dunaways' claims in the Class Action Lawsuit, the Evanston Policies do not cover Harbor Walk for injuries occurring at the Dunaways' property, listed in the complaint from the Class Action Lawsuit as 27037 Flaggy Run Rd., Courtland, Virginia, 23837. Compl., Exh. A at ¶ 7. Specifically, the coverage in the Evanston Policies is limited by two relevant provisions. The first is a section entitled

"Limitation of Coverage to Designated Premises or Project." Compl., Exh. D at 28, Exh. E at 31, Exh. F at 34. The section limits the application of coverage to "bodily injury," property damage," "personal injury," "advertising injury" and medical expenses arising from the listed premises and projects. Id. The only listed premises and projects are located in Norfolk, Virginia. There are no listed premises or projects in Courtland, Virginia. The second section is a General Change Endorsement that limits coverage to the locations listed in the endorsement. Compl., Exh. D at 51; Exh. E at 46; Exh. F at 48, 55-56. None of the locations listed is a location in Courtland, Virginia.[14] Id. Accordingly, the Evanston Policies do not cover the Dunaways' claims against Harbor Walk in the Class Action Lawsuit.

Regarding the Jackson Lawsuit, the alleged injuries seem to have occurred after coverage under the policy expired. The Evanston Policies cover "bodily injury" or "property damage" caused by an "occurrence" that "occurs during the policy period." Compl., Exh. D at 29; Exh. E at 32; Exh. F at 35. The Evanston Policies define "property damage" to include loss of use, Compl., Exh. D at 40; Exh. E at 43; Exh. F. at 46, and they define "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Compl., Exh. D at 38; Exh. E at 41; Exh. F at 44. Coverage under the Evanston Policies expired on October 8, 2007. Compl., Exh. F at 4, 57-58. According to the complaint filed in the Jackson Lawsuit, the Jacksons did not close on their property until October 24, 2008. Compl., Exh. C at ¶ 39. Any injuries the Jacksons suffered at their property could not have

---

[14] This makes sense because, in the complaint from the Class Action Lawsuit, the Dunaways' allege that they built their own home and their claims are against the defendants that sold them the drywall. Compl., Exh. A at ¶ 8. Harbor Walk does not seem to have been involved with the installation of Chinese drywall at the Dunaways' property and, therefore, the Dunaways' property is not listed in the Evanston Policies.

occurred until after the policy expired and, therefore, are not covered by the Evanston Policies.

## V. CONCLUSION

For the reasons previously discussed, the Court **FINDS** that the pollution exclusions in the Evanston Policies bar from coverage the Homeowner Defendants' claims in the Underlying Lawsuits, and, therefore, that Evanston has no duty to defend or indemnify Harbor Walk against those claims. Therefore, Evanston's Motion for Summary Judgment is **GRANTED**.

The Clerk is **DIRECTED** to send a copy of this order to all counsel of record.

**IT IS SO ORDERED.**

_____
Raymond A. Jackson
United States District Judge

Norfolk, Virginia
September _7_, 2011